# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JUDSON ATKINSON CANDIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 2203 |
| | ) | |
| LATINI-HOHBERGER DHIMANTEC, | ) | Judge Ruben Castillo |
| ET. AL., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Judson Atkinson Candies, Inc. ("Judson") filed suit in the United States District Court for the Western District of Texas against L Liquidation Company f/k/a LMC International ("LMC") for damages incurred upon the failure of a candy-making machine that LMC sold to Judson. (R. 221, Pl.'s Mot. for Choice of Law at 1; R. 116, Pl.'s Corrected First Am. Compl. ¶ 8.) On January 20, 2004, after a trial at which LMC did not appear, the court entered final judgment against LMC for breach of contract in the amount of $2,772,033 for actual and additional damages; prejudgment interest on Judson's actual damages in the amount of $55,369.35; and postjudgment interest on the total sum of $2,827,402.35 from January 20, 2004, until the judgment is paid in full. (R. 116, Pl.'s Second Am. Compl. ¶ 9.) Judson never collected its judgment and filed a new lawsuit to collect its original judgment. (R. 116-1, Pl.'s Corrected First Am. Compl. ¶ 9.; R. 68-4, Docket.) The court *sua sponte* transferred this case to the Northern District of Illinois on *forum non conveniens* grounds, pursuant to 28 U.S.C. § 1404(a)(2). (R. 214, Pl.'s Facts ¶ 9.)

In this suit, Judson alleges that LMC fraudulently transferred its assets to the named

defendants for the purpose of avoiding the judgment debt in violation of Texas's Uniform Fraudulent Transfer Act ("UFTA"). Judson named the following defendants as parties to this suit: LMC; Carroll International Corporation ("CIC"), the parent company of LMC; CIC's President and LMC's Chairman and CEO, Barry Carroll ("Carroll"); Latini-Hohberger Dhimantec, Inc. f/k/a Dhiman Industries ("Dhimantec"); Roger Hohberger ("Hohberger"), Vice President of Dhimantec and former Vice President of Sales for LMC; and James Elsen ("Elsen"), Vice President and CEO of CIC and secretary-treasurer of LMC, (collectively "Defendants").[1] Judson seeks to pierce LMC's corporate veil based on an alter ego theory in order to hold CIC and the individual defendants liable for LMC's judgment. Judson alleges that Carroll, Elsen, and Hohberger misused the corporate form by transferring LMC's assets to third parties in order to avoid paying Judson the judgment. Judson further alleges that Dhimantec is the alter ego of LMC and should be held liable for LMC's judgment.

Currently before the Court are Carroll's motion to strike exhibits filed with Judson's motion for summary judgment (R. 235-1); CIC and Elsen's motion to strike Judson's facts (R. 249-1); Defendants' motion for sanctions and to strike (R. 252-1); Judson's motion for choice of law (R. 221-1); Judson, Elsen and LMC, Carroll, Hohberger and Dhimanatec, and CIC's cross-motions for summary judgment (R. 199-1; R. 203-1; R. 207-1; R. 212-1; R. 219-1); CIC's motion to strike and compel the return of a privileged document (R. 270-1); Carroll's motion to bar evidence (R. 193); Judson's motion to redesignate restricted documents as public documents (R. 273-1); and Judson's motion to designate public documents as restricted documents (R. 276-

---

[1] Defendant Arminder Dhiman resides in India and was dismissed for lack of service. Defendant James Lindeman was dismissed as a result of a settlement agreement. (R. 221, Pl.'s Mot. for Choice of Law at 5.)

2

1). The Court will address the motions to strike first and then will resolve the parties' substantive motions.

## RELEVANT FACTS[2]

In November 1980, L Machine Company Inc. was incorporated in the state of Illinois. (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 4.) On November 25, 1996, L Machine Company changed its name to LMC International, Inc. (*Id.* ¶ 5.) Throughout LMC's existence, the outstanding shares of LMC's stock were wholly owned by CIC. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 13.) The outstanding shares of CIC's stock are owned by Carroll, and the Wallace E. and Lelia H. Carroll 1958 Trust of which Carroll is the sole beneficiary. (*Id.*) Carroll is the President and Chairman of CIC, which operated from his house for over the past year. (*Id.* ¶ 14.) By 2001, Carroll was also serving as the CEO and Chairman of LMC, but prior to this time, Dave Kiel ("Kiel") held this position. (R. 214, Pl.'s Facts, Ex. 2, Kiel Letter; *Id.*, Ex. 12, Loan Docs.) Peter Loveland ("Loveland") was President of LMC. (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 19.) From 1991 until 2005, Elsen was the Vice President and Chief Operations Officer of CIC and the Secretary-Treasurer of LMC. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 15.) Elsen has never owned stock in CIC, LMC, Dhimantec, or any Carroll entities, nor is he a beneficiary of any of the named trusts. (R. 228, Pl.'s Resp. to Elsen's Facts ¶¶ 13-14.)

Hohberger began working for LMC in 1996. (R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 4.) Prior to that time, Hohberger and his father operated a candy machinery manufacturing company known as Hohberger Manufacturing, Inc. (*Id.* ¶ 1.) The

---

[2] These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1(b). Unless otherwise indicated, the facts included herein are undisputed.

3

company manufactured a line of machinery which produced hard candies and other confectionery products. (*Id.*) In October 1996, LMC acquired the assets of Hohberger Manufacturing, Inc. (*Id.* ¶3-4.) After the 1996 acquisition, Hohberger worked as an employee of LMC, but he never acquired any shares of LMC or became a director. (*Id.* ¶ 4-5.) From 2001 until 2003, Hohberger held the position of Vice President of Sales of LMC. (*Id.* ¶ 6.)

LMC engaged in various corporate functions including: filing yearly reports with the Illinois Secretary of State, (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 9); issuing stock certificates to CIC, (*id.* ¶ 11); and obtaining financing from third parties, (*id.* ¶ 12). LMC also conducted annual meetings and executed unanimous consents for certain corporate activities. (*Id.* ¶ 10.) LMC also incurred mortgages on its real property through MB Financial. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 17.) The proceeds of these loans were deposited into the CIC Sweep Account.[3] (*Id.* ¶ 17; R. 214, Pl.'s Facts, Ex. A, Elsen Dep. at 198; R. 246, CIC and Elsen's Resp. to Pl.'s Facts ¶¶ 17, 20.) On at least three occasions, LMC sought CIC's approval for LMC's expenditures. (R. 214, Pl.'s Facts, Ex. 1, 4-5.) LMC had employees separate from CIC. (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 13.)

CIC conducted no annual meetings and was characterized by Elsen as a holding company. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 22.) CIC issued stock certificates to its shareholders. (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 24.) CIC also filed yearly reports with the Delaware Secretary of State. (*Id.* ¶ 22.) At all relevant times, CIC did not generate any revenues of its

---

[3] LMC and CIC used a sweep account, which is a cash management system "where all cash is centralized in one bank account but where each corporation is given credit for its share of the cash." *See Ellis v. Koppers, Inc.*,04 CV 160, 2006 WL 2432092 at *4 (N.D. Miss. Aug. 21, 2006) (defining a sweep account); R. 244, CIC's Resp. in Opposition to Pl.'s Mot. for Partial Summ. J. at 3 (same).

own, but derived its revenues through its subsidiaries and from contributions from its shareholders. (*Id.*, Ex. 1, Elsen Dep. at 346.) CIC made 401k contributions for LMC employees and paid for their group insurance. (R. 246, CIC and Elsen's Resp. to Pl.'s Facts ¶ 21.) After 2003, CIC and LMC operated from the same address, but prior to this time, CIC and LMC operated from separate addresses. (R. 232, Pl.'s Resp. to CIC's Facts ¶ 27.) In the fall of 2002, LMC executed a promissory note in favor of CIC in the principle amount of $11,199,788.22. (R. 232, Pl.'s Resp. to CIC's Facts, Ex. 9, Promissory Note; R. R. 224, Pl.'s Resp. to Carroll's Facts ¶ 33.) CIC claims that over the course of 12 years, it infused approximately $11 million dollars into LMC to pay various expenses, but Judson disputes the existence of this loan. (*Id.* ¶ 31.)

Also during the fall of 2002, CIC began seeking prospective purchasers for LMC. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 25.) (R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 7.) The decision was made after an independant company, BBK, Ltd., performed a viability analysis study and recommended the sale of LMC. (R. 232, Pl.'s Resp. To CIC's Facts ¶ 37.) Once CIC made the decision to sell LMC's assets, Carroll marketed LMC's real property and improvements for sale under his brokerage company, CIC realty. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 27.) King Street LLC purchased LMC's property.[4] (*Id.* ¶ 27; R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 14.) The majority of the proceeds were used to pay off LMC's

---

[4] Carroll argues that the advertisement relied on by Judson in Exhibit 16 to establish that the property sold to King Street LLC for 1.6 million is hearsay. This Court agrees. *See Bethel v. Aikens*, 92 CV 492RP, 1994 U.S. WL 266565 (N.D. Ind. Mar. 9, 1994) (noting that newspaper articles and advertisement contained in exhibits constitute inadmissible hearsay and cannot, therefore, be considered by the court in determining the existence of a triable issue of fact). However, other evidence has established that the property sold to King Street, how the proceeds were used, and how much King Street paid for the property. *See* R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 14; R. 239, Carroll's Resp. to Pl.'s Facts, Ex. 4, Elsen Dep. at 104; R. 228, Pl.'s Resp. to Elsen/CIC's Facts ¶ 21.

mortgage and line of credit with MB Financial. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 27; *Id.*, Ex. 4, Elsen Dep. at 104; R. 214, Pl.'s Facts, Ex. 17.) In July 2003, LMC sold its Coating and Panning Products Group to Bosch for $300,000. (R. 224, Pl.'s Resp. to Carroll's Facts, Ex. 18, Bosch Sales Agreement.)

Seeking to market LMC's remaining assets, Elsen and Loveland attended a trade show for candy machinery in Germany, where they met Arminder Dhiman ("Dhiman"), owner of Dhiman Industries. (R. 243, Pl.'s Resp. To Hohberger/Dhimantec's Facts ¶¶ 7-9.) From early 2003 through the fall of 2003, CIC conducted negotiations with Dhiman for the sale of LMC's remaining assets. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 32.) Prior to these negotiations, LMC and Dhiman had some business dealings. (R. 232, Pl.'s Resp. To CIC's Facts ¶ 42.) LMC entered into a distribution agreement with Dhiman, in which LMC agreed to distribute Dhiman Industries' equipment in the United States, Mexico and Canada. (*Id.*; R. 246, CIC and Elsen's Resp. to Pl.'s Facts ¶ 32.) Ultimately, LMC was unable to sell Dhiman's equipment, and in October 2003, Dhiman reacquired the equipment and purchased from LMC the Hohberger Products Group and the Latini Products Group for a total acquisition price of $475,000. (R. 246 CIC and Elsen's Resp. to Pl.'s Facts ¶ 33; R. 239, Carroll's Resp. to Pl.'s Facts ¶ 33; R. 232, Pl.'s Resp. To CIC's Facts ¶ 42.)

After the closing of the Dhiman/LMC purchase agreement, Hohberger went to work for Dhiman Industries and purchased 10 percent of its stock for the sum of $80,000. (R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 35.) Dhiman Industries subsequently became Latini-Hohberger-Dhimantec, Inc. ("Dhimantec") and has two shareholders: Snazy Health Products, Ltd. and Hohberger. (*Id.* ¶ 36-37.) LMC had about 15 employees at the time of the sale to

Dhimantec. (*Id.* ¶ 39.) After the purchase of LMC's assets, Dhimantec hired five former employees of LMC. (*Id.*) Hohberger was never employed by both LMC and Dhimantec at the same time. (*Id.* ¶ 41.) Furthermore, Hohberger did not have any authority to negotiate with Dhiman for the sale of LMC's assets; he was not involved in the sale of any of LMC's other assets; nor did he have any role in deciding what LMC did with the proceeds of the sale of its assets. (*Id.* ¶¶ 17, 19-20, 33.)

In regards to LMC's remaining assets, additional tooling and equipment belonging to LMC were sold to Deister Products, a Carroll subsidiary, for unknown consideration. (R. 239, Carroll's Resp. to Pl.'s Facts ¶ 34.) Carroll Manufacturing, another Carroll subsidiary, also purchased some of LMC's equipment, although the consideration paid for the equipment is disputed. (R. 232, Pl.'s Resp. to CIC/Elsen's Facts ¶ 59.) In late 2003, LMC liquidated its remaining assets and executed an "Assignment for the Benefit of Creditors," whereby its remaining assets were assigned to James Lindeman for liquidation and payment to LMC's remaining creditors. (R. 232, Pl.'s Resp. to CIC/Elsen's Facts ¶ 59.) LMC is no longer in business. (*Id.*)

Throughout its history, LMC sold several candy making machines to Judson. (*Id.* ¶ 14.) In 2002, Judson filed suit in Texas against LMC claiming that one of the machines was defective. (R. 200, Carroll Memo. in Support of Summ. J. at 1.) Prior to trial, LMC did not disclose to Judson Atkinson that it had ceased operations altogether and conveyed all of its assets to other entities. (R. 246, CIC and Elsen's Resp. to Pl.'s Facts ¶ 36.) Instead, LMC sent correspondence to Texas, notifying the court that it had dismissed its counsel and would not appear for the scheduled January 2004 trial. (*Id.*; R. 214, Pl.'s Facts, Ex. 28, Letter.) In 2004, Judson obtained

7

a judgment against LMC in LMC's absence. (R. 116-1, Pl.'s Corrected First Am. Compl. ¶ 9.; R. 68-4, Docket.) Collection of this judgment is currently at issue in the present case.

## I. Carroll's Motion to Strike Exhibits

### A. Exhibits 1-9 and 12-28

Carroll argues that all of Judson's exhibits included with its motion for summary judgment should be stricken because Judson failed to lay a foundation for the exhibits and none of the documents have been authenticated. "In evaluating a summary judgment motion, the court may consider as evidence properly authenticated and admissible documents or exhibits." *Scott v. Edinburg*, 346 F.3d 752, 760 n.7 (7th Cir. 2003); *Woods v. City of Chi.*, 234 F.3d 979, 988 (7th Cir. 2001). "To be admissible, documents must be authenticated by an affiant through whom the exhibits could be admitted into evidence." *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006); *Scott*, 346 F.3d at 760 n.7.

Generally speaking, the proponent of the proffered evidence need only make a *prima facie* showing that the exhibit is what the proponent claims it is. *See United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir. 1994). While Judson has failed to authenticate any of the exhibits attached to its summary judgment motion through an affidavit, this Court will not strike these exhibits because they have been authenticated by Carroll. While Carroll argues that these documents were not produced to him in discovery, Carroll does not contest that most, if not all, of these documents were obtained in the underlying litigation from LMC. *See* R. 259, Carroll's Reply to Pl.'s Resp. to Carroll's Mot. to Strike at 5 ("Plaintiff also produced a CD-ROM containing thousands of documents produced by LMC in the underlying litigation."); *See also* R. 256, Pl.'s Resp. to Carroll's Mot. to Strike, Ex. E, Bates Numbering for Exs. 1-7, 13-27.) As

8

Chairman and CEO of LMC, these documents were within Carroll's control. In fact, Elsen testified in his deposition that there were LMC documents "under the control of Barry Carroll in a storage facility at his residence." (R. 256, Pl.'s Resp. to Carroll's Mot. to Strike, Elsen Dep. at 56.) "When a party has produced the document in question in response to a subpoena or discovery request, he has implicitly authenticated the document." *United States v. Lawrence*, 934 F.2d 868, 871-72 (7th Cir. 1991); *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (admitting evidence where that evidence was found in a criminal raid on a place under a defendant's control and the evidence otherwise appeared to have been belong to the defendant); *see also United States v. Munoz*, 16 F.3d 1116, 1121 (9th Cir. 1994) (finding that documents may be found authentic where there are discovered in the defendant's possession); *Brown & Williamson Tobacco Corp. v. Jacobson*, 644 F. Supp. 1240, 1253 (N.D. Ill. 1986). The Bates numbers on Exhibits 1-7 and 13-27 confirm that they were produced by LMC, as they are prefaced with the letters "LMC." (R. 256, Pl.'s Resp. to Carroll's Mot. to Bar, Ex. E, Letter.) Accordingly, we find that Exhibits 1-7 and 13-27 were authenticated.[5]

Judson claims that it also received the remaining exhibits, Exhibits 8-12 and 28, from Defendants in the underlying litigation. While Carroll does not dispute this, Judson does not provide any Bates numbers for these exhibits. Nevertheless, circumstantial evidence demonstrates the authenticity of these exhibits. In determining authenticity based on circumstantial evidence, a court can consider whether the "[a]ppearance, contents, substance,

---

[5] Furthermore, Defendants' reliance on Exhibit 14, the LMC/CIC promissory note, implicitly authenticates the exhibit. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (noting that a document is admissible if the defendant relies on the exhibit).

9

internal patterns, or other distinctive characteristics, taken in conjunction with circumstances" indicate that the evidence is what the party purports it to be. Fed. R. Evid. 901(b)(4); *United States v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000). Exhibits 9, 12, and 28 are documents either to or from officers of LMC or CIC prepared on LMC or CIC company letterhead, or documents to LMC or CIC officers; Exhibit 8 is a letter terminating LMC's lease for a scanner. Upon review, there is nothing about these documents that render their authenticity questionable. In fact, because these documents were more likely than not turned over by Defendants; because the contents of the documents indicate that they were likely prepared during the course of business; and because these documents appear to be what Judson purports them to be, we find that Exhibits 8, 9, 12, and 28 have been sufficiently authenticated. *See Woods*, 234 F.3d at 988 (finding that "the district court did not abuse its discretion in admitting the arrest report and the misdemeanor complaint as business records without requiring the defendants to authenticate them by affidavit").

## B. Exhibits 10 and 11

Exhibit 10 and 11 are charts that Judson prepared of the allegedly fraudulent transfers from LMC and CIC to third parties. These plaintiff-prepared charts, however, are not evidence; rather, labeling them "fraudulent transfers" is a legal argument, which is improper in a statement of facts. *Malec v. Sandford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Furthermore, Exhibits 10 and 11 do not support the allegation that the transactions were fraudulent: 86 of the checks were written before Judson ever filed the first lawsuit against LMC, making it difficult to presume that CIC/LMC were evading a judgment that had yet to exist; and twelve of the checks are payable to Seyfarth Shaw LLP., a prominent Chicago law firm, and there is no evidence suggesting that they

10

participated in this fraud. *See APS v. Sports Time, Inc.*, 299 F.3d 624, 629 (7th Cir. 2002) (plaintiff has to prove that fraudulent transfer was made to an "insider," which by definition excludes Seyfarth Shaw, who were Defendants' attorneys, not corporate officers, director, or employees).[6] Judson does not even attach the actual checks of the allegedly fraudulent transfers to Exhibits 10 and 11, opting instead to improperly include them as a part of its response to Carroll's motion to strike its exhibits.[7] Accordingly, this Court strikes Exhibits 10 and 11 from the record.

By extension, this Court strikes Paragraph 23 of Judson's facts, which is supported solely by exhibits 10 and 11. Paragraph 23 states:

> During the period from November 12, 1999 through September 20, 2005, fraudulent transfers were made from CIC's bank account to various entities controlled by Carroll, including Carroll himself, his wife Barbara P. Carroll, Yorktown Peripheral JV, Holden Investments, Wallace E. & Lelia Carroll Trust 5-1-58 fbo B J Carroll, Lelia Carroll Trust 7-12-62 fbo B J Carroll, Wallace Carroll Trust 12-20-79, Wallace E Carroll Trust 7-1-57, W E Carroll Trust 1-20-61, W E Carroll Trust fbo W E Carroll and Wildwood Investments. During this same time frame fraudulent transfers were made to other entities for inadequate consideration. [See list of transfers, Ex.'s 10-11]. The aggregate total of the transfers is $7,879,494.03.

---

[6] In fact, Judson admits that some of the transfers were not made to insiders, as required by Illinois law, R. 214, Pl.'s Memo. in support of Summ. J. at 7. *See Aps Sports*, 299 F.3d at 629 ("Under the UFTA, 'insider' is a term that is used to establish whether a transfer is fraudulent.")

[7] Judson contends that the checks were too voluminous to be attached to its motion for summary judgment and it opted instead to include a summary of the transactions, which is permissible pursuant to Rule 1006 of the Federal Rules of Evidence. While it is unlikely that these checks were too voluminous to be attached to Judson's motion for summary judgment, we need not resolve this issue because the "admission of a summary under Fed. R. Evid. 1006 requires 'a proper foundation as to the admissibility of the material that is summarized and . . . [a showing] that the summary is accurate.'" *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir. 1990) (internal citations omitted). We have already determined that the contents of Exhibits 10 and 11 are not admissible.

Even if this Court did not strike exhibits 10 and 11, Paragraph 23 constitutes an improper legal conclusion. *Malec*, 191 F.R.D. at 584. Paragraph 23 also is not properly supported by a citation to the record. Judson argues that the transfers are fraudulent because CIC and LMC made the transfers at a time when LMC and CIC were insolvent, per Elsen's admission, and the transfers were made without receiving reasonably equivalent consideration. (R. 258, Pl.'s Resp. to CIC/Elsen's Mot. to Strike at 8.) Judson, however, mischaracterizes Elsen's deposition testimony. In his deposition, Elsen did not state that CIC and LMC were insolvent. He admitted that CIC was experiencing cash flow difficulties, and that CIC was operating at a loss, (R. 258, Pl.'s Resp. to CIC/Elsen's Mot. to Strike, Ex. A, Elsen Dep. at 137), but he also stated that CIC derived revenues from its subsidiaries, (*Id.*, Ex. A, Elsen Dep. at 89). Furthermore, this Court could not find any statements by Elsen that LMC was insolvent nor did Judson identify any citations to the record that support its assertion that the transfers were made for inadequate consideration. *Malec*, 191 F.R.D. at 584 ("Factual allegations not properly supported by citation to the record are nullities."). For the foregoing reasons, Paragraph 23 is stricken from the record.

**II.     Elsen and CIC's Motion to Strike Judson's Statement of Uncontested Facts**

Elsen and CIC seek to strike portions of Judson's statement of facts for violating Local Rule 56.1(a)(3)'s requirements for a movant's undisputed statement of material facts. As this Court held in *Malec*, "[t]hree operative concepts animate this rule: facts, short, and specific." 191 F.R.D. at 583. In other words:

> [A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions in a 56.1(a) statement on the off-chance that one's opponent might not file a correct response . . . Additionally, the 56.1(a) statement should be limited to material facts, that is, facts pertinent to the outcome of the issues identified in the summary judgment motion . . . Finally, 'specific reference' means

12

including proper Bluebook citations to exact pieces of the record that support the factual contention contained in the paragraph. In other words, citations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document: District courts are not obliged in our adversary system to scour the record looking for factual disputes.

*Id.* (internal citations omitted). Following these standards, we resolve Defendants' motion to strike below.

### A.      Paragraph 17

First, Elsen and CIC ask this Court to strike Paragraph 17 of Judson's statement of facts on the grounds that Judson misstates and misquotes the evidence and the testimony that it cites to support its assertion. In Paragraph 17, Judson states:

Carroll caused LMC to incur a mortgage on real property owned by LMC on or about April 18, 2001 through Manufacturers Bank in the amount of $1,360,000.00. Concurrently therewith, LMC obtained a line of credit with the bank in the amount of $400,000.00. [Ex. 9]. The proceeds of those loans were deposited into the accounts of CIC and utilized by CIC as described in paragraph 12 below. [Deposition of James Elsen, V3, pg 198].

Paragraph 12 reads that "Judson Atkinson determined facts evidencing a scheme of fraudulent conveyances made by LMC, [CIC] and [Carroll] to avoid the Judgment." Paragraph 12 is a legal conclusion, however, that cannot be used as evidence to support a statement of fact. *Malec*, 191 F.R.D. at 585. Also, Judson cites to exhibit 9 and Elsen's deposition testimony as support for Paragraph 17. Elsen's deposition testimony states that LMC took out at loan used to finance its operations from March of 2001 through the end of its existence, and the actual proceeds of the loan were deposited into the CIC sweep account. Elsen did not testify, however, that Carroll "caused LMC to take out the loan." Finally, Exhibit 9—the loan document signed by Elsen, an officer of LMC—does not mention Carroll. At most, the cited evidence shows that CIC had

13

access to the loan proceeds, but it does not show that CIC used LMC's funds in order to set up

fraudulent conveyances to avoid paying LMC's default judgment.[8] Therefore, the language that

"*Carroll caused LMC* to incur a mortgage" and the language "proceeds of those loans were . . .

*utilized* by CIC as described in paragraph 12 below" is stricken from Paragraph 17.

## B. Paragraph 27

Elsen and CIC next ask the Court to strike Paragraph 27 of Judson's statement of facts.

In Paragraph 27, Judson states: "In an effort to legitimize the transaction [*i.e.*, the March 2003

sale of LMC's manufacturing plant], CIC instructed LMC's controller to enter retroactive journal

entries on LMC's books to record a 'mortgage payable' and 'line of credit.' [Ex.17]."[9] CIC

argues that the cited evidence does not support this statement; however, Exhibit 9 does support

Judson's statement. Upon reviewing the document, the Court cannot completely rule out

Judson's assertion in Paragraph 27 of its statement of facts. The document is dated February 19,

---

[8] Even if we consider the documents Judson improperly attached to its response brief rather than its statement of facts, it shows at most that CIC intended to use only a portion of the loan proceeds for its own purposes but it also indicates that "the vast majority of the funds will be used to support LMC activities." (R. 224, Pl.'s Resp. to Carroll's Mot. for Summ. J., Ex. 13, Elsen Letter to MB Financial at 2.)

[9] Relying on the "law of the case" doctrine, Judson alleges that all of evidence submitted earlier in this litigation with its motion to dismiss is evidence that cannot be challenged by Defendants because this evidence was previously admitted without objection and now constitutes the law of the case. (R. 258, Pl.'s Resp. to CIC/Elsen's Mot. to Strike at 2.) The law of the case doctrine, however, has to do with a court following its own precedent, and has nothing to do with a court giving precedential authority to any documents or exhibits that the plaintiff previously submitted to the court. *See generally North Mississippi Communications, Inc. v. Jones*, 951 F.2d 652, 655-656 (5th Cir. 1992) ("the law of the case doctrine dictates that *a prior decision of this court* will be followed without re-examination . . . unless (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work manifest injustice") (emphasis added). Therefore, Defendant's motion to strike challenging Judson's Statement of Facts was proper and timely filed.

2002; it lists several mortgage transactions with instructions to "record in 2001;" and finally, the document states that "CIC will continue to make payments on the mortgage and at year end will send LMC an entry to record the years transaction on their books." (R. 214 , Pl.'s Facts, Ex. 9.) As the cited evidence seems to support Paragraph 27, this Court will not strike this paragraph.

### C. Paragraph 19 and 20

CIC and Elsen next seek to strike Paragraphs 19 and 20. In Paragraph 19, Judson states that:

> An analysis of LMC performed by an outside consultant revealed that LMC had no separate bank account; all deposits and disbursements were made into CIC's account; CIC determined what disbursements were paid from this account; and transfers were made to and from between [sic] LMC and CIC routinely.

CIC argues that Exhibit 7,[10] which Judson relies on to support this proposition, does not state that LMC did not have separate bank accounts nor does it support the statement that CIC determined what disbursements were paid. Upon review, it is clear that Exhibit 7 does, however, provide support for Judson's statement. Exhibit 7 states:

> The same general ledger account is used to record both the regular and payroll bank accounts, which are physically separate accounts at the same bank. Prior to the split off of Deister, two separate general ledgers were maintained for the two operations, with separate general ledger accounts although both operations used the same physical bank accounts.

Thus, Exhibit 7 indicates that LMC and CIC were operating out of the same accounts. Exhibit 7 also supports Judson's statement that CIC determined what disbursements were made from the account. The exhibit states that: "Due to the current cash shortage, the selection of what is paid

---

[10] Exhibit 7 is unlabeled, but it is an excerpt from the viability study performed by BBK, Ltd., an independent company. (R. 256, Pl.'s Resp. to Carroll's Mot. to Strike at 6.)

is partially determined by the available cash as determined by CIC." Thus, Exhibit 7 confirms that CIC has, at least during some unidentified time frame, determined what disbursements were made from this account when payment is made by computer generated check. The Court will therefore not strike Paragraph 19 from the record.[11]

CIC also contests Paragraph 20 of Judson's statement of facts, which asserts that "Elsen acknowledged the practice that LMC's funds were swept into CIC's account, and disbursed as dictated by CIC." Contrary to CIC's claim that Judson has mischaracterized the testimony of Elsen, Elsen's deposition testimony does acknowledge that LMC's funds were being swept into CIC's account as Elsen testified that a late payment by a LMC customer caused CIC's account to overdraft. Thus, this Court will not strike Paragraph 20.

**D.      Paragraph 29**

CIC and Elsen also seek to strike Paragraph 29, which states:

In July, 2003, CIC sold a portion of LMC's assets to Bosch: (1) its Coating and Panning Products Group ("CPP") for a sales price of $300,000 plus 10% of CPP sales over the next three years; (2) LMC's right, title and interest in U.S. Patent No. 5,495,418 ("'418 patent") for a sales price of $220,000; and (3) a Model BCP-24 belt coating machine for a sales price of $80,000.

The supporting exhibits, however, show that CIC sold the aforementioned assets for a total price

---

[11] There is also other evidence in the record that supports the proposition that CIC determined what disbursements would be made as a matter of course. CIC received a letter from Northern Trust regarding an overdraft condition of CIC's accounts. (R. 214, Pl.'s Facts, Ex. 1, Elsen Dep. at 137-140.) The bank indicated that it would not cover any more checks in the future. (*Id.* at 137.) Elsen testified that CIC was experiencing cash flow difficulties at the time, and the overdraft in the CIC account resulted from a LMC customer being late in paying an obligation. (*Id.* at 138.) Elsen also discussed a document in which he wrote down which accounts would get paid if the LMC customer paid his obligation and which accounts would not get paid if the customer does not pay. (*Id.* at 137-138.) Some of these accounts included bills for other CIC entities. (*Id.*)

of $300,000. Exhibit 19 states that LMC "agrees to sell, assign, transfer and deliver to Buyer, and Buyer agrees to purchase all of the CPP assets . . . of every kind and description, tangible and intangible . . . ," (*id.* at 1), which includes "[s]uch Bills of Sale, assignments, and other instruments of transfer necessary or desirable for transferring or assigning hereunder to Buyer good and marketable title to the Assets," (*id.* at 8), for a sales price of $300,000, (*id.* at 15) Considering this language, it is evident that the assignment of the '418 patent (Ex. 20) and the sale of the Model BCP-24 belt coating machine (Ex. 21) were included within the purchase price of $300,000 as stated in the Asset Purchase and Sales Agreement for the Coating and Panning Products Group. (R. 214, Pl.'s Facts, Ex. 19, Sales Agreement at 8, 15.) Accordingly, to the extent that Paragraph 29 suggests that Bosch paid more than $300,000 for LMC's Coating and Panning Products Group, it is stricken.

### E.    Paragraph 30

The Court also strikes Paragraph 30 of Judson's statement of facts because it is not supported by the evidence. Paragraph 30 states that "CIC utilized the $220,000 proceeds [from the sale of its CPP group] to pay its legal bills." Exhibit 22, which Judson uses to support this proposition, unequivocally contradicts this statement because it indicates that the money was used to pay LMC's legal bills, not CIC's. Exhibit 22 is a memo from Elsen to Loveland and Tanda Gerleve, another LMC officer, and is entitled "Payments Made By CIC on behalf of LMC." The document states that "CIC paid Seyfarth, Shaw $220,000 in partial satisfaction of the $390999.45 *you* own [sic] them." (emphasis added). Because the recipients of the memo were LMC officers, the "you" referred to in the memo is LMC, not CIC. Consequently, this paragraph is stricken from the record.

17

### F.     Paragraph 18

In Paragraph 18, Judson asserts that Loveland sent an email noting that "we will operate

as a subsidiary of CIC, not an independent corporation." Loveland did in fact make this

statement, and this is pertinent to the ultimate issue in this case. The Court, therefore, denies

CIC's motion to strike Paragraph 18.

### G.     Paragraph 16

CIC and Elsen argue that Exhibits 1-3, 4-5, and 8 do not support Judson's assertion in

Paragraph 16 that "CIC made all decisions concerning capital expenditures and acquisitions

concerning LMC." Exhibits 1-3 concern a lease for machinery and include a memo in which

Elsen authorizes Kiel, CEO of LMC, to enter into the lease. Exhibit 4-5 show LMC officers

seeking approval from Elsen for capital expenditures and to purchase new computer equipment.

Exhibit 8 is a past due notice for a scanner addressed to CIC c/o Latini Machine.[12] Given the fact

that LMC had to seek authorization from CIC for financial expenditures and also Elsen's dual

role as both treasurer of LMC and president of CIC, these documents support Judson's assertion

that CIC made financial decisions concerning LMC. Therefore, this statement will not be

stricken from the record.

### H.     Paragraph 31

Citing to Exhibit 23 in Paragraph 31, Judson states, "Upon information and belief, CIC

may have sold additional equipment and inventory to Bosch for an aggregate sales price of

$315,000." (R. 214, Pl.'s Facts ¶ 31.) Indeed, Exhibit 23 is an offer by Elsen to Bosch to

---

[12] In November 1996, L Machine Company changed its name to LMC
International Inc. (R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 5.) The "L" in L
Machine Company stands for Latini. (*Id.*)

purchase additional LMC assets associated with LMC's Cooking and Processing Products. Accordingly, the Court denies CIC and Elsen's motion to strike Paragraph 31.

## I.     Paragraph 24

In Paragraph 24, Judson asserts that during the period from November 12, 1999 through September 20, 2005 both LMC and CIC were insolvent. Although Judson cites to Elsen's deposition testimony to support this proposition; as discussed above, Elsen never said that CIC was insolvent. (R. 258, Pl.'s Resp. to CIC/Elsen's Mot. to Strike, Ex. A, Elsen Dep. at 137.) Therefore, this Court strikes this statement because it is not properly supported by citations to the record. *Malec*, 191 F.R.D. at 583.

## J.     Paragraph 35

In Paragraph 35, Judson states:

CIC acknowledged that it retained all liabilities of LMC, including the underlying Judson Atkinson lawsuit. Nonetheless, CIC purposefully engaged in the foregoing fraudulent transfers during the pendency of the underlying lawsuit, with actual intent to hinder, delay and defraud Judson Atkinson in violation of [Texas law] and without receiving a reasonably equivalent value in exchange for the transfers and conveyances as set forth in Section 24.005(a)(2).

In support of Paragraph 35, Judson cites to Exhibits 10 and 11. As this Court has already stricken Exhibits 10 and 11, Paragraph 35 is not supported by the record. *Malec*, 191 F.R.D. at 583. Furthermore, Judson's assertion that CIC engaged in fraudulent transfers is a legal conclusion. (*Id.*) Therefore, Paragraph 35 is stricken from the record.

## K.     Paragraphs 12

CIC and Elsen next seek to strike Paragraph 12. Paragraph 12 states:

In the course of post-judgment discovery, Judson Atkinson determined facts evidencing a scheme of fraudulent conveyances made by LMC, CIC and Barry J. Carroll to avoid the

19

Judgment and initiated this civil action.

Like Paragraph 35, Paragraph 12 states a legal conclusion in violation of the local rules. *See Malec*, 191 F.R.D. at 583. Accordingly, this Court strikes Paragraph 12.

### L.    Paragraphs 25, 26, 27, 28, 29, 31, 32, 33, and 34

Lastly, CIC and Elsen argue that Judson asserts facts that are not relevant to its motion for summary judgment. Specifically, CIC and Elsen argue that Judson's summary judgment brief does not utilize the facts referenced in Paragraphs 25, 26, 27, 28, 29, 31, 32, 33, and 34. Each of these paragraphs potentially support Judson's contention that CIC and LMC operated as a single business enterprise, an assertion at the heart of this case. As these statements are relevant to whether CIC and LMC operated as one entity, they will not be stricken.

## III.    Defendants' Motion for Sanctions and to Strike Judson's Responses to Defendants' Motions for Summary Judgment and Judson's Statement of Facts

On October 4, 2006, Judson's counsel issued at least two separate subpoenas to MB Financial and Northern Trust Company, requesting certain bank records for defendants Carroll and CIC, but Judson did not provide Defendants with notice of the subpoenas. (R. 252, Defs.' Mot. to Strike at 1; R. 257, Pl.'s Resp. to Mot. to Strike at 1.) Judson subsequently received hundreds of documents from the banks, but failed to reveal these documents or provide copies to Defendants until one business day before their summary judgment briefs were due. (R. 252, Defs.' Mot. to Strike at 2.) Because of this, all of the defendants have filed this motion asking this Court to sanction Judson by: (1) striking Judson's responses to Defendants' motions for summary judgment and statements of material fact; (2) requiring Judson to return all documents

to MB Financial and Northern Trust; (3) barring Judson from utilizing any information received from MB Financial and Northern Trust Company pursuant to the subpoenas; (4) requiring Judson to pay attorneys fees and costs associated with filing this motion to strike; and (5) requiring Judson to provide Defendants with all subpoenas issued to third parties in this litigation. (R. 252, Defs.' Mot. to Strike at 9.) Judson claims that it inadvertently failed to serve copies of the subpoenas on counsel for the Defendants, due to a missed communication between the offices of Judson's respective counsel. (R. 257, Pl.'s Resp. to Defs.' Mot. to Strike at 1.)

Federal Rule of Civil Procedure 45(b)(1) requires a party issuing a subpoena to provide "prior notice [to] . . . each party in the manner prescribed by Rule 5(b)." Judson does not dispute that it violated this rule. District courts have discretion in determining the penalties for discovery violations, such as a violation of Rule 45(b). *See Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003). When determining what sanctions are appropriate for discovery violations, courts generally consider: (1) the success of the moving party, (2) prejudice to the party, (3) ability to cure prejudice, and (4) bad faith or willfulness. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *Bronk v. Ineichen*, 54 F.3d 425, 432 (7th Cir. 1995). With respect to Rule 45, most courts focus on prejudice to the aggrieved party. *See Zinter Handling, Inc. v. G.E.*, 04 CV 500, 2006 WL 3359317, at *2 (S.D.N.Y. Nov. 16, 2006) ("such untimely notice under Rule 45(b)(1) does not automatically trigger quashing a subpoena without a consideration of prejudice to the aggrieved party"); *Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660, 667-68 (refusing to quash subpoena for violation of Rule 45(b)(1) where aggrieved party failed to show prejudice from the violation); *Seewald v. IIS Intelligent Info. Sys.*, 93 CV 4258, 1996 WL 612497, at *5 (E.D.N.Y. Oct. 16, 1996) (denying preclusion where no prejudice shown). In

21

determining prejudice, the Court considers the period of delay in providing notice, any pattern of noncompliance with rules of procedure, the conduct of the serving party if documents were obtained after untimely notice, and whether the subpoena is otherwise objectionable. *Zinter Handling, Inc.*, 2006 WL 3359317 at *2. We will look at each of these factors in turn.

Judson has engaged in some questionable behavior during the course of this litigation. This Court has had to admonish Plaintiff's counsel in the past for not taking discovery deadlines seriously. (R. 193-2, Carroll's Mot. to Bar, Ex. 1, Court Transcript at 10-11.) Plaintiff also has not been strictly compliant with the local rules, as evidenced by Defendants' motion to strike and this Court's decision to partially grant Defendants' motion. There was also delay in providing notice of the third party subpoenas to Defendants. The parties dispute when exactly Judson received the documents from the banks; however, it is clear that Judson received the first batch of documents from MB Financial on October 19, 2006, which is weeks before it mailed the CD ROM containing all of the documents to Defendants. (R. 252, Mot. to Strike, Ex. 2, Letter from MB Financial to Plaintiff.) Furthermore, MB Financial produced a second installment of documents on November 2, 2006 and a third installment on November 6, 2006, although plaintiffs inaccurately claim that the last installment was received on November 13, 2006. (R. 257, Pl.'s Resp. to Mot. to Strike at 2.) Judson did not turn over any documents until November 15, 2006, more than ten days after the close of discovery and a full month after this Court's deadline for turning over all documents in support of its claims.

Judson argues that all of the documents produced in response to the subpoenas were produced in prior discovery by CIC, Elsen, or Carroll. According to Judson, for this reason its inadvertent failure to provide copies of the subpoena can hardly be considered bad faith nor can it

22

be viewed to have prejudiced the defendants because it took steps to correct the problem. (*Id.* at 8.) Judson further argues that it settled the Rule 45 issues through its stipulation to Defendants that it would not use any subpoenaed documents which had not been previously produced by the Defendants, although it does not attach proof of this stipulation to its response. (*Id.*)

There are several problems with this contention. First, Judson's counsel blatantly misrepresented to Defendants' counsel when the documents were received. (R. 253, Mem. in Support of Defs.' Mot. to Strike, Ex. 6, Email.) Second, compliance with Rule 45 would have given Defendants an opportunity to object to subpoenas that they might find questionable, especially in light of the fact that Judson subpoenaed the *current* financial records of Carroll, his wife, and his children, information which may or may not be relevant to allegedly fraudulent transfers that took place at least four years ago. Lastly, while Defendants do not dispute that many of the documents were turned over to Judson during the prior litigation against LMC, this does not mean that counsel for each of the defendants have seen these records, as none of the current counsel were counsel in the LMC litigation and none of the current defendants, with the exception of LMC, were defendants in the underlying LMC litigation. (*Id.* at 4.) Furthermore, over 150,000 documents were produced in this litigation, and Judson failed to specify all of the documents that support its claims, as requested by Defendants' Requests to Produce;[13] in

---

[13] In "Request No. 1," Carroll asked Judson to produce "Any and all documents relating to or supporting your allegation that Carroll made fraudulent transfers to any person or entity" to which Judson responded "Documents responsive to this Request are in the possession and control of the Defendant. . . ." (R. 256, Pl.'s Resp. to Carroll's Mot. to Bar, Ex. A, Pl.'s Resp. to Carroll's First Request for Prod. of Docs., Request No. 1.) Contrary to Judson's response, Defendants are not required to guess which documents Judson will use to support its theory of the case. Furthermore, Judson indicated that the documents produced in response to the subpoenas were already in its possession since at least January 13, 2005, long before the discovery deadline in this case. (R. 257, Pl.'s Response to Defs.' Mot. to Strike at 7.)

violation of this Court's order,[14] (R. 192-3, Carroll's Mot. to Bar, Ex. 1, Court Transcript at 14);

and as required by Federal Rule of Civil Procedure 34(b).[15] Consequently, Defendants had no

way of knowing, prior to filing its motions for summary judgment, which of the documents

produced in response to the subpoenas were already in its possession and would be used to

support Judson's claims.

Therefore, any documents produced by MB Financial and Northern Trust Bank pursuant

to the improper subpoenas will be stricken from the record. In addition, because there is

evidence of bad faith and prejudice to Defendants, this Court orders Judson to pay Defendants'

attorneys fees and costs associated with the filing of this motion as a sanction for violating Rule

45. Defendants' motion to strike and for sanctions is granted.

---

[14] At the status hearing on September 26, 2006, this Court gave Judson until October 13, 2006 to supplement any discovery answers in this case. Judson failed to do so, therefore Judson was limited to its answers already in the record in terms of where Judson could go on any of its theories of the case. (R. 192-3, Carroll's Mot. to Bar, Ex. 1, Court Transcript at 14.) Judson did not identify or produce any of the documents at issue prior to October 13, 2006, even though Judson admits that these documents were already in its possession prior to sending the subpoenas. (R. 257, Pl.'s Response to Defs.' Mot. to Strike at 5.)

[15] Rule 34(a) reads in pertinent part, "(a) Scope. Any party may serve on any other party a request (1) to produce and permit the party making the request . . . to inspect and copy, any designated documents . . . which are in the possession, custody or control of the party upon whom the request is served." Fed. R. Civ. P. 34. Rule 34(b) states in part, "(b) Procedure. The request shall set forth, either by individual item or by category, the items to be inspected and describe each with reasonable particularity. The request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts. . . . A party who produces documents for inspection shall . . . organize and label them to correspond with the categories of the request." *Id.*

## IV.    Parties' Motions for Summary Judgment

### LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 249 (citations and quotations omitted). When considering cross-motions for summary judgment, the Court will construe all facts and make all reasonable and justifiable inferences in favor of the party against whom the motion under consideration was made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

### LEGAL ANALYSIS

Judson alleges that Defendants fraudulently transferred LMC's assets for the purpose of avoiding the judgment debt. (R. 116, Pl.'s Corrected Sec. Am. Compl.) Judson argues that almost $8 million of LMC's assets were fraudulently conveyed to Carroll, Carroll's wife Barbara, the respective trusts of which Carroll is the sole beneficiary, and to Dhimantec, which is allegedly the alter ego of LMC. (R. 213, Pl.'s Mem. in Support of Summ. J. at 6; R. 221, Pl.'s Mot. for Choice of Law ¶¶ 7-9, 12.) Judson also alleges that Hohberger and Elsen materially aided in the fraudulent transfers. (*Id.*) Judson has moved for partial summary judgment against

25

CIC, Carroll, and Elsen, and asks this Court to pierce LMC and CIC's corporate veil in order to hold these defendants liable for LMC's judgment. CIC, Carroll, and Elsen have filed cross motions for summary judgment, arguing that Judson has not demonstrated that LMC and CIC's corporate veil should be pierced. Judson has not moved for summary judgment against Hohberger and Dhimantec, but these parties have moved for summary judgment on Judson's claims. Before we resolve these motions, we must first determine which jurisdiction's laws applies to each of these claims.

## A. Choice of Law

The United States District Court for the Western District of Texas *sua sponte* ordered the transfer of this case to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). When a district court sits in diversity, it must apply the choice of law principles of the forum state to determine which state's substantive law governs the proceedings. *Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941)). Therefore, this Court must determine which state's laws applies to this litigation using Illinois choice of law principles.

Judson is alleging that Defendants used the corporate form in order to make fraudulent transfers to avoid paying a judgment.[16] As this Court would have to pierce the corporate veil to

---

[16] Determining which jurisdiction's laws apply to this action involves applying different choice of law principles, as this Court would have to pierce the corporate veil in order to find Defendants guilty of making fraudulent transfers, which is a tort. *See Stromberg*, 77 F.3d at 933 (distinguishing between the choice of law principles applied to torts and veil piercing claims). In cases such as this, the Seventh Circuit approved the application of a concept known as "depecage," or "the process of applying rules of different states on the basis of the precise issue involved," which we apply here. *See In re Air Crash Disaster near Chicago*, 644 F.2d 594, 611 (7th Cir. 1981).

find the defendants guilty of making fraudulent transfers, the Court will first determine which state's law applies to piercing the corporate veil. "Efforts to 'pierce the corporate veil' are governed by the law of the state of incorporation." *Stromberg Metal Works v. Press Mech.*, 77 F.3d 928, 933 (7th Cir. 1996).

Prior to its dissolution, defendant LMC was an Illinois corporation with its principle place of business in Elmhurst, Illinois. (R. 239, Carroll's Resp. to Judson's Facts ¶ 7.) Defendant CIC is a Delaware corporation with its principal place of business in Lake Forest, IL. (*Id.* ¶ 3.) Defendant Dhimantec is an Illinois corporation with its offices and principal place of business in Elmhurst, IL. (*Id.* ¶ 2.) Since the law of the state of incorporation governs these actions, *Stromberg*, 77 F.3d at 933, we will apply Illinois law to determine whether to pierce LMC's corporate veil and hold CIC, Carroll, Elsen, Dhimantec, and Hohberger liable for LMC's judgment. In determining whether to pierce CIC's corporate veil to hold Carroll and Elsen liable, we will apply Delaware law. Finally, we will apply Illinois law in determining whether to pierce Dhimantec's corporate veil and hold Hohberger liable for LMC's judgment. At the outset, we note that Delaware law is almost identical to Illinois law as it relates to veil piercing claims. *See Retzler v. Pratt & Whitney Co.,*723 N.E. 2d 345, 354 (Ill. App. Ct. 1999) (stating that Delaware law is almost identical to Illinois law as it relates to veil piercing claims).

The Court next must determine what law applies to the tort of fraudulent transfers. *See Fid. Nat'l Title Ins. Co. v. Howard Sav. Bank,* 436 F.3d 836, 840 (7th Cir. 2006) (fraudulent transfer is a tort similar to fraud). For tort actions, Illinois courts must determine which forum has the "most significant relationship" to the case. *Esser v. McIntyre*, 661 N.E. 2d 1138, 1141 (Ill. 1996). In determining whether Illinois has the most significant relationship to the case, this

Court considers: "(1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Esser*, 661 N.E. 2d at 1141 (internal citations omitted). "In practice, this means that the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id.*

The allegedly fraudulent transfers and the checks allegedly written to facilitate the fraud took place in Illinois and all of the individual defendants are domiciled in Illinois. Defendant Elsen resides in Lisle, Illinois, (*id.* ¶ 4.), defendant Hohberger resides in McHenry, Illinois, (*id.* ¶ 5.), and defendant Carroll resides in Lake Forest, IL, (*id.* ¶ 6). However, even though most of the parties are domiciled in Illinois and the injury causing conduct occurred in Illinois, Judson is a Texas corporation with its principle place of business in Texas and the injury occurred in Texas. It is likely, therefore, that Illinois and Texas both have equal interest in this litigation. *See* Restat 2d of Conflict of Laws, § 148 ("This contact [the place of the injury causing conduct] is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to persons.")

Nevertheless, although both Texas and Illinois have an interest in this litigation and neither jurisdiction is considerably more favored than the other, other factors weigh in favor of applying Illinois law. Since more of the parties are located here and most of the conduct at issue occurred here, most of the evidence would be located here. Although the location of the evidence is usually pertinent to deciding the appropriate venue rather than the substantive law that applies to the case, many of the same considerations used to decide venue are pertinent to the choice of law analysis. *See generally Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (noting

28

that the appropriateness of a certain venue is related to the court's familiarity with the state law that must govern the case); *Rotec Indus. v. Aecon Group, Inc.*, 436 F. Supp. 2d 931, 936-937 (N.D. Ill. 2006) (finding that the choice of law determination is relevant to deciding which venue is appropriate). Arguably, if Illinois is a more appropriate venue for this case, then Illinois has a greater interest than Texas in its outcome on the merits, all other considerations being equal. We note, however, that both Texas and Illinois have adopted the UFTA; therefore, it is likely that the same outcome would result regardless of which jurisdiction's laws we apply. *See* Tex. Bus. & Com. Code § 24.001; 740 ILCS 160/1, *et seq.* Nonetheless, to the extent that there are any differences, we opt to apply Illinois law.

### B. Corporate Veil Claims

#### 1. Piercing LMC's Corporate Veil

LMC is an Illinois corporation; therefore, we apply Illinois law to determine whether LMC is a shell corporation and Judson is entitled to pierce the corporate veil and levy on the defendants' personal assets to the full extent of its judgment. *Stromberg,* 77 F.3d at 933; *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 419 F.3d 594, 597 (7th Cir. 2005). Essentially, piercing the corporate veil is a determination by this Court that the corporation is not a separate entity from its shareholders or officers, but merely their 'alter ego.'" *Brandon,* 419 F.3d at 597. Courts are reluctant to pierce the corporate veil, *Roiser v. Cascade Mt., Inc.*, 855 N.E. 2d 243, 251 (Ill. App. Ct. 2006), and will do so only if two requirements are met: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that an adherence to the fiction of a separate corporate existence would promote injustice or inequitable consequences."

29

*McCracken v. Olson Companies, Inc.*, 500 N.E.2d 487, 491 (1986); *Hystro Prods. v. MNP Corp.*, 18 F.3d 1384, 1388-1389 (7th Cir. 1994). To determine whether there is sufficient "unity of interest and ownership" between two corporations, Illinois focuses on multiple factors:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 840 NE 2d. 767, 778 (Ill. App. Ct. 2005).

### a.    CIC

Judson argues that LMC's corporate veil should be pierced to hold CIC, its parent corporation, liable for LMC's judgment because LMC is the alter ego of CIC.   "A corporation is a legal entity separate and distinct from its shareholders, directors, and officers . . . That same principle 'applies even where one corporation wholly owns another and the two have mutual dealings.'" *Joiner v. Ryder Sys.*, 966 F. Supp. 1478, 1483 (C.D. Ill. 1996).  Furthermore, "[a] parent corporation, by virtue of its ownership interest, may direct a subsidiary's actions, and the subsidiary will have no choice but to obey.  A parent corporation may disregard the subsidiary's independence at its whim." *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 757 (7th Cir. 1989).  As illustrated below, Judson has not identified facts sufficient to show that CIC and LMC operated as a single entity, but instead demonstrated that CIC and LMC respected the corporate form and also engaged in the legitimate collaboration expected between a parent and a subsidiary.

LMC and CIC observed corporate formalities: LMC filed the appropriate records with the Illinois Secretary of State, (R. 199, Carroll's Mot. for Summ. J., Ex. 1, Art. of Inc.; *Id.*, Ex. 2,

30

Art. of Inc.; R. 232, Pl.'s Resp. to CIC's Facts ¶ 15; R. 224, Pl.'s Resp. to Carroll's Facts ¶ 9);

LMC issued stock certificates to CIC, (R. 232, Pl.'s Resp. to CIC's Facts ¶ 17); LMC kept its

own books and records, (*Id.*, Ex. 4, LMC Fin. Rec.; *Id.*, Ex. 5, LMC Fin. Rec.); LMC conducted

board meetings[17] and the board executed unanimous consents for certain corporate activities, (R.

224, Pl.'s Resp. to Carroll's Facts ¶ 10; R. 240, Elsen Aff., Ex. C); and LMC entered into

contracts in its own name, (R. 214, Pl.'s Facts, Ex. 19, Contract between LMC and Bosch Corp.).

*Compare Hystro*, 18 F.3d at 1390 (finding that the parent and the subsidiary did not observe

corporate formalities because neither had separate books or financial statements or conduct board

meetings); *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991) (finding

that the subsidiaries were the alter ego of the dominant shareholder where, among other things,

the subsidiaries never filed articles of incorporations or bylaws or conducted board meetings).

Judson argues, however, that LMC and CIC did not respect corporate formalities because

LMC had employees and officers in common with CIC; CIC owned all of LMC's stock; CIC

purchased LMC's insurance; and CIC involved itself in the day-to-day affairs of LMC. (R. 213,

Pl.'s Mot. for Partial Summ. J. At 3-4.) It is clear, however, that "[s]tock control and common

officers and directors are generally prerequisites to piercing the corporate veil. However, those

factors are not sufficient by themselves to invoke the doctrine for 'such factors are common

business practice and exist in most parent and subsidiary relationships.'" *C M Corp. v. Oberer*

*Development Co.,* 631 F.2d 536, 539 (7th Cir. 1980) (internal citations omitted). Furthermore,

---

[17] Judson disputes that LMC conducted board meetings, and points to Elsen's deposition testimony that CIC conducted no board meetings to support its argument. (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 10.) This citation clearly does not support Judson's argument that LMC did not conduct board meetings as Elsen specifically references CIC. Therefore, this fact is deemed admitted. *Malec*, 191 F.R.D. at 583.

such oversight and shared functions is common in the parent-subsidiary context. *See, e.g.,*
*United States v. Bestfoods*, 524 U.S. 51, 72 (1998) (normal parent relationship involves
"monitoring the subsidiary's performance"); *Allstate Motor Club, Inc. v. SHL Systemhouse, Inc.*,
97 C 5354, 1998 WL 575279 at *7 (N.D. Ill. Sept. 1, 1998) ("Members of a corporate family
commonly consolidate certain functions, such as payroll and legal services, to increase efficiency
and reduce cost. Such a sharing of resources, however, does not collapse the separately
incorporated entities into one.").

The only evidence that Judson can point to indicating that LMC did not observe corporate
formalities is the fact that LMC had not filed tax returns since 1999. (R. 224, Pl.'s Resp. to
Carroll ¶ 10.) However, LMC's failure to file tax returns is not, by itself, enough to prove that
LMC and CIC have the unity of interest required for alter ego liability, especially in light of all of
the other evidence indicating otherwise. *See Liberty Mut. Ins. Co. v. M&O Springfield Co.*, 94 C
6408, 1997 U.S. Dist. LEXIS 19092 (N.D. Ill. 1997) (refusing to pierce the corporate veil where
the defendant failed to file tax returns for two subsequent years, but otherwise complied with
corporate formalities, was adequately capitalized, and maintained separate bank accounts);
*Barber v. Production Credit Servs. (In re KZK Livestock)*, 221 B.R. 471, 479 (C.D. Ill. 1998)
(finding that because of the existence of other factors indicating the separate corporate existences
of the defendants, their failure to file tax returns should not be accorded great weight).

Judson further argues that LMC operated with CIC as a single business enterprise because
LMC did not have its own bank accounts; CIC determined which accounts payable were to be
paid; CIC marketed and sold LMC; CIC sold the real property where LMC operated; CIC made
decisions regarding the capital expenditures by LMC; and CIC disposed of the proceeds of loans

32

obtained by LMC. (R. 213, Pl.'s Partial Mot. for Summ. J. at 3.)

While Illinois law does not address whether the use of a sweep account by a parent and its subsidiary can constitute an inappropriate commingling of finances relevant to the alter ego analysis, other courts have found that this factor has no bearing in determining whether a court should pierce the corporate veil. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995) ("Courts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system"); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 00 C 2447, 2003 WL 21542487 (N.D. Ill. July 3, 2003) (applying Delaware law and finding that "[c]oordinated banking arrangements between parent corporations and their subsidiaries are also common and do not justify piercing the corporate veil"); *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 34 (D. Mass. 1987) ("a centralized cash management system . . . is not the equivalent of intermingling funds" and is insufficient to justify disregarding the corporate form); *United States v. Bliss*, 108 F.R.D. 127, 132 (E.D. Mo. 1985) (cash management system indicative of the "usual parent-subsidiary relationship"); *Japan Petrol Co. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 846 (D. Del. 1978) (consolidated cash system is a "function of administrative convenience and economy rather than a manifestation of control").

As further evidence that CIC was utilizing LMC's funds for its own purposes, Judson asserts that CIC used LMC's funds to pay CIC's legal bills; however, the exhibit it cites to says otherwise—the subject of the document is "Payments made by CIC **on behalf of LMC**." R. 214, Pl.'s Facts, Ex. 22, Seyfarth Shaw letter (emphasis added). In other words, LMC's funds were being used to pay LMC's legal bills, not CIC's legal bills as Judson alleges. In short, Judson has not presented sufficient proof that CIC was siphoning LMC's funds for its own personal use.

33

Judson further claims that CIC made "all decisions concerning capital expenditures and acquisitions." However, authorization from the parent company for expenditures is not only reasonable, but such actions are appropriate in the parent-subsidiary context. *Joiner,* 966 F. Supp. 1478, 1485 (C.D. Ill. 1996) ("it is entirely appropriate for a parent corporation to approve major capital expenditures of its subsidiaries"). Other courts agree that this type of conduct is typical of a majority shareholder or parent. *See, e.g., Doe v. Unocal Corp.,* 248 F.3d 915, 927 (9th Cir. 2001) (applying a test identical to the Illinois standard and finding that a "parent corporation may be directly involved in financing and micro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is its alter ego"); *Phoenix Canada Oil Co. v. Texaco,* 842 F.2d 1466, 1476 (3d Cir. 1988) (declining to pierce the corporate veil where the subsidiary was required to secure approval from the parent for large investments and acquisitions or disposal of major assets); *Akzona v. Du Pont,* 607 F. Supp. 227, 237 (D. Del. 1984) (no alter ego finding where parent approval required for expenditures exceeding $850,000); *Japan Petrol Co.,* 456 F. Supp. at 843 (same, where parent approval required for expenditures exceeding $250,000).

Furthermore, LMC was adequately capitalized through its own revenues, CIC, and other third parties. CIC lent LMC millions of dollars in order to help LMC avoid bankruptcy. (R. 199, Carroll's Mot. for Summ. J., Ex. 6, Promissory Note.) Judson argues that CIC was insolvent from 1999 until 2005; and therefore, CIC could not have possibly lent LMC millions of dollars. There is evidence in the record, however, that CIC obtained revenue from its subsidiaries, but it is not clear if this revenue was sufficient to render CIC solvent. (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 24.) Even if we assume that CIC was insolvent, the focus in alter ego analysis is usually

34

on the solvency of the debtor corporation, or in this case LMC, and not the solvency of its parent corporation. *See Ted Harrison Oil Co. v. Dokka*, 617 N.E. 2d 898, 901 (Ill. App. Ct. 1993) (noting that insolvency of the debtor corporation is relevant to veil piercing analysis). Judson has not pointed to any evidence in the record that LMC, rather than CIC, was insolvent. Furthermore, LMC obtained financing from MB Financial on at least two separate occasions, indicating that it was not wholly dependant upon CIC for its financing. (R. 214, Pl.'s Facts, Ex. 12, Loan Docs.) LMC's efforts to stay in operation by obtaining a bank loan and possibly borrowing money from CIC are factors that weigh strongly in favor of not piercing the corporate veil, as this indicates LMC was a real corporation rather than a sham. *See Lumpkin v. Envirodyne Indus.*, 159 B.R. 814, 820 (N.D. Ill. 1993) ("Undercapitalization has been a significant factor in many veil piercing cases. It lends itself to analysis as disrespect for the corporate form, as fraudulent intent, and as resulting in injustice.").

Finally, Judson relies on an email where Loveland, LMC's President, stated that "we will operate as a subsidiary, not an independent corporation." (R. 214, Pl.'s Facts, Ex. 6.) Such references fail to demonstrate that the subsidiary is an alter ego or "mere instrumentality" of the parent. *See Esmark*, 887 F.2d at 757; *Joiner*, 966 F. Supp. at 1490 ("the parent owns the subsidiary, it can do anything it wants with its subsidiary—the subsidiary has no choice but to obey"); *see also Fletcher*, 68 F.3d at 1460 (noting that the district court properly rejected the plaintiffs' argument that the descriptions of the relationship between the parent and subsidiary as well as the presence of the parent's logo in subsidiary's promotional literature justified piercing the corporate veil). These facts, therefore, do not illustrate that LMC and CIC operated as a single entity but rather shows that CIC and LMC engaged in the legitimate collaboration

35

expected between a parent and a subsidiary. *See Joiner*, 966 F. Supp. at 1483 ("[a] corporation is a legal entity separate and distinct from its shareholders, directors, and officers . . . That same principle 'applies even where one corporation wholly owns another and the two have mutual dealings.' To disregard that well-established principle, a plaintiff has a 'substantial burden' to overcome.") (internal citations omitted); *Main Bank of Chicago v. Baker*, 427 N.E. 2d 94, 101 (Ill. 1981).

Judson also has not presented evidence that would satisfy the second prong of this inquiry, that an "overall element of injustice or unfairness . . . [is] present." Judson is seeking to pierce LMC's corporate veil in order to recover on a judgment; however, "a parent corporation may not be held to account for the liabilities of a subsidiary unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters." *Esmark,* 887 F.2d at 753. There is insufficient evidence that CIC misused the corporate form to such an extent that it should be disregarded and Judson be allowed to recover LMC's judgment nor has Judson shown that an overall element of injustice is present. Accordingly, we find that Judson has not presented sufficient evidence that will permit this Court to pierce LMC's corporate veil and find that LMC was CIC's alter ego. Therefore, CIC's motion for summary judgment is granted.

### b.    Carroll

Judson alleges that "Carroll, through the instrumentalities of his alter egos CIC and LMC . . . fraudulently transferred assets to avoid paying a default judgment to Judson." (R. 233, Pl.'s Resp. to Carroll's Mot. for Summ. J. at 2.) Although shareholders of a corporation ordinarily are considered to be distinct entities shielded from personal liability for the corporation's obligations, courts have been known to "pierce the corporate veil" and hold a shareholder liable

36

for corporate acts. *Ted Harrison Oil Co.,* 617 N.E. 2d at 902 (stating that "the party seeking to have the corporate entity disregarded has to come forward with a substantial showing that the corporation is really a dummy or a sham for a dominating personality").

Throughout its existence, the outstanding shares of LMC's stock were wholly owned by CIC. The outstanding shares of CIC's stock are owned by Carroll and the Wallace E. And Lelia H. Carroll 1958 Trust of which Carroll is the sole beneficiary. (R. 214, Pl.'s Facts, Ex. 1, Elsen Dep. at 7-8.) Therefore, Carroll, for all intents and purposes, owns all of CIC and LMC's stock. We now proceed to determine whether LMC was the alter ego of Carroll.

Applying Illinois law, we find that LMC was not Carroll's alter ego. Carroll is the sole shareholder and owner of LMC, indirectly through his ownership of CIC. This is one factor to be considered in alter ego analysis, but it is not dispositive of the claim entirely, as Judson would have us believe. *See Laborers' Pension Fund v. Litgen Concrete Cutting & Coring Co.*, 709 F. Supp. 140, 144 (N.D. Ill. 1989) (finding that the fact that the corporation is closely held is insufficient, standing alone, to warrant piercing the corporate veil). As explained above, LMC engaged in corporate formalities. It had other officers and employees; it was adequately

capitalized; and Carroll did not treat LMC's assets as his own.[18] From the record, it appears that the corporate form was respected and that LMC was not a sham corporation subject to Carroll's whims. Accordingly, Carroll's motion for summary judgment is granted.

### c.    Dhimantec

Judson argues that "Dhimantec is simply a continuation of LMC under a new name, operating at the same location with the same employees, under the same leadership, selling the same products to the same customers." (R. 116, Pl.'s Second Am. Compl. ¶ 16.) Judson further argues that LMC, under the direction and control of defendants Carroll, Elsen, and Hohberger, fraudulently transferred part of its assets to Dhimantec. (*Id.* ¶ 12, 14) Presumably, this Court has to determine: (1) whether Dhimantec is the alter ego of LMC or in the alternative, (2) whether Dhimantec can be held liable for LMC's debt because of successor liability.

Applying Illinois law, we find that there are no issues of material fact as to whether Dhimantec is the alter ego of LMC. Outside of the fact that Dhimantec currently operates in the same location as that previously occupied by LMC, there is no evidence that Dhimantec failed to maintain adequate corporate records; has commingled funds or assets with LMC, is

---

[18] Judson points to evidence that Carroll personally guaranteed LMC's loan from MB Financial as evidence that LMC was Carroll's alter ego. However, these documents were produced by MB Financial in response to the improper subpoenas that violated Rule 45. (R. 232, Pl.'s Resp. to CIC's Facts, Ex. 13, Correspondence between Elsen and MB Financial.) Therefore, these documents are excluded by this Court's order. *See* Part III *infra.* Nevertheless, Carroll's personal guarantee of the loan does not automatically indicate that he utilized this money for his own personal activities, or that he was in any way siphoning LMC's funds. In fact, it is not unusual for a shareholder in a closely held corporation to guarantee the corporation's loan from a bank. *See In re Kaiser*, 791 F.2d 73, 75 (7th Cir. 1986) (noting that shareholders of closely held corporations will guarantee loans to the corporation in order to reduce the corporation's interest expense).

undercapitalize, or treated LMC's assets as its own. (R. 243, Pl.'s Resp. to

Hohberger/Dhimantec's Facts ¶¶ 44-46, 49). Hohberger and five other LMC employees went to

work for Dhimantec after it acquired a portion of LMC's assets. (*Id.* ¶¶ 35, 39.) There is nothing

in the record, however, to indicate that these individuals were working for both LMC and

Dhimantec at the same time or that they owned any stock in LMC, (*id.* at 55), factors that are

significant in the alter ego analysis. *Hystro Prods.,* 18 F.3d at 1389 ("Stock control and the

existence of common officers and directors are generally prerequisites to the piercing of the

corporate veil.") (internal citations omitted). Furthermore, the individual who formed

Dhimantec, Arminder Dhiman, has never owned LMC stock nor was he ever an employee,

officer, director, or agent of LMC. (R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 8; R.

219, Hohberger/Dhimantec Mot. for Summ. J., Ex., Dhiman Affidavit). The unity of ownership

required to pierce the corporate veil from LMC to Dhimantec is not present. *McCracken*, 500

N.E.2d at 491. Consequently, there is no danger that adherence to the separate corporate

existences would "promote a fraud or injustice." *Id.*

Similarly, Dhimantec cannot be held liable for LMC's judgment based on the theory of

successor liability. "Generally, when one corporation transfers or sells its assets to another, the

latter corporation does not assume the debts and liabilities of the former." *National Soffit &

Escutcheons v. Superior Sys.*, 98 F.3d 262, 266 (7th Cir. 1996). However, courts will impose

successor liability where there is: "(1)an implied or express agreement to assume the obligation;

(2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a

de facto consolidation or merger; or (4) instances where the purchaser is a mere continuation of

the seller." *Id.* at 266. Furthermore, "for one corporation to be deemed a successor corporation in

39

the first place, it must be a successor to all, or substantially all, of another corporation's assets."
*Id.* None of these factors are present here. Judson has not pointed to any evidence in the record
that would indicate that LMC's sale of its assets to Dhimantec was anything other than a
legitimate transaction. Also, Dhimantec did not purchase all or substantially all of LMC's assets.
Dhimantec purchased LMC's Hohberger Products Group and Latini Products Group, but Bosch
Corporation purchased LMC's Coating and Panning Products Group, and King Street LLC
purchased LMC's real estate. The remainder of LMC's assets were liquidated. Accordingly,
Dhimantec is not a successor corporation liable for LMC's judgment nor is it LMC's alter ego;
therefore, its motion for summary judgment is granted.

### d.    Hohberger

Judson contends that Hohberger materially participated in Carroll's efforts to defraud
Judson of its judgment against LMC because Hohberger participated in Dhiman's acquisition of
LMC's assets. Judson specifically argues that Hohberger "disregarded his fiduciary duty as an
officer of LMC to Plaintiff as a judgment creditor, and acquiesced to the sale to Dhimantec, in
order to continue his employment there and acquire an ownership interest in Dhimantec." (R.
242, Pl.'s Resp. to Hohberger/Dhimantec's Mot. for Summ. J. at 8-9.) As this Court has
dismissed Dhimantec from this action because LMC's sale of its assets to Dhimantec was
legitimate, it similarly cannot pierce Dhimantec's corporate veil in order to find that Hohberger is
liable. Furthermore, to the extent that Judson is arguing that Hohberger committed any
wrongdoing as an officer of LMC, Judson has not identified any facts sufficient to let us pierce
the corporate veil or impose liability nor has Judson alleged that Hohberger somehow dominated
the corporate form. *See Musco Corp. v. Qualite, Inc.*, 92 C 591, 1994 U.S. Dist. LEXIS 9799

(N.D. Ill. July 14, 1994) (noting that liability will be imposed where a corporate officer has treated the corporation's assets as his own and used it as a 'mere instrumentality' of the officer); *see also C.B. Mills v. Hawranik*, 91 C 5797, 1994 WL 113088, \*9 (N.D. Ill. Mar. 30, 1994) ("A corporation's *controlling* shareholder, officer, or director is not entitled to the protections of a corporate entity where the corporation is merely the "alter ego" or business conduit of a dominating personality.") (emphasis added). Judson admits that Hohberger did not have the authority to sign checks for LMC, (R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶ 6); that Elsen, not Hohberger, negotiated with Dhiman to sell LMC's assets, (*id.* ¶ 15); and that Hohberger had no role in deciding what LMC did with the proceeds of the acquisition, (*id.* ¶ 33). Hohberger's limited power while he was an LMC employee undermines the notion that there was "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." *McCracken*, 500 N.E.2d at 491. Furthermore, Judson has not identified any facts to indicate that Hohberger was in any way responsible for the sale of LMC's assets to Dhiman or that he, together with Dhimantec, participated in any type of scheme to defraud Judson. *See* R. 243, Pl.'s Resp. to Hohberger/Dhimantec's Facts ¶¶ 31, 32, 41, 44, 45, 46. Accordingly, Hohberger's motion for summary judgment is granted.

## 2. Piercing CIC's Corporate Veil

CIC is a Delaware corporation; therefore, Delaware law applies here in determining whether to pierce its corporate veil. *Stromberg Metal Works, Inc.*, 77 F.3d at 933. Similar to Illinois law, courts will pierce the corporate veil only in exceptional circumstances. *See, e.g.*, *Gadsden v. Home Pres. Co.*, No. Civ. A. 18888, 2004 WL 485468 (Del. Ch. Feb. 20, 2004) (piercing the corporate veil where the corporation had no assets, and its sole employee and owner

41

used his own personal tools for each job, took all of the corporation's excess cash and profits, and paid for the company's supplies with his personal checks); *Equitable Trust Co. v. Gallagher*, 99 A.2d 490 (Del. 1953) (finding that the corporation was the defendant's alter ego where he owned the majority of its shares, dominated its operations, and stated that he is the corporation).

Under Delaware law, "a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992). Courts are reluctant to disregard the corporate form and will only do so "where equitable considerations require it." *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, Civ. A. No. 8578, 1990 WL 44267 at *5 (Del. Ch. Apr. 12, 1990); *Mason v. Network of Wilmington, Inc.*, No. Civ. A. 19434, 2005 WL 1653954 at *2 (Del. Ch. July 1, 2005) ("Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears."); *see also Gadsden*, 2004 WL 485468 at *4 (citing *Martin v. D.B. Martin Co.*, 88 A. 612, 616 (Del. Ch. 1913)) ("A court of equity will disregard the separate legal existence of a corporation where it is shown that the corporate form has been used to perpetrate a fraud or similar injustice.").

To pierce the corporate veil under Delaware law, a plaintiff must show: "(1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'" *Harper v. Del. County Broadcasters*, 743 F. Supp. 1076, 1085 (D. Del. 1990) (internal citations omitted); *Brown v GE Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 235 (Del. Bankr. Ct. 2003). Among the factors the Court considers are:

whether the corporation was adequately capitalized for the corporate undertaking;

42

whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Harper*, 743 F. Supp. at 1085. In considering these factors, we next determine if CIC's corporate veil can be pierced to hold Carroll and Elsen liable for LMC's judgment.

### a. Carroll

Even if we adopt Judson's position and try to hold Carroll liable by piercing CIC's corporate veil, Judson's claim would still fail because this Court has already determined that LMC was not CIC's alter ego. Liability will not attach indirectly through Carroll's status as the sole shareholder and potential alter ego of LMC's parent corporation because one of the primary purposes of doing business as a corporation is to insulate shareholders from unlimited liability for corporate activity. *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 838 (D. Del. 1978). Moreover, "[t]hose in control of a corporation are not typically liable for distinctly corporate obligations by reason of that control." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del. Ch. 1987); *see also Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, No. C. A. 11514, 1992 WL 127567 (Del. Ch. May 28, 1992) (finding that a partnership was dominated and controlled by certain employees of the corporate entity but noting that this does not inevitably lead to the conclusion that the corporate entity controlled and directed the operations of the partnerships). Therefore, it is irrelevant whether Carroll and CIC are alter egos for purposes of holding Carroll liable for LMC's judgment as long as CIC and LMC, and Carroll and LMC respected the corporate form. However, the same reasons that LMC

43

is not Carroll's alter ego applies to CIC—Judson has not identified facts sufficient to allow this Court to conclude that CIC and Carroll operated as a single economic entity.

In analyzing whether LMC was CIC's alter ego, we found that CIC engaged in corporate formalities separate from LMC. *See* Part IV(B)(1)(a) *infra*. CIC also issued stock certificates to its shareholders, (R. 224, Pl.'s Resp. to Carroll's Facts ¶ 24); and filed yearly reports with the Delaware Secretary of State, (*id.* ¶ 22). Judson, however, focuses mainly on CIC's solvency. At all relevant times, CIC did not generate any revenues of its own, but derived its revenues through its subsidiaries and from contributions from its shareholders. (R. 224, Pl.'s Resp. to Carroll's Facts, Ex. 1, Elsen Dep. at 346.) The fact that CIC's sole source of revenues was from its subsidiaries is not dispositive. To find otherwise would be to penalize CIC for being a holding company, which is a perfectly legitimate use of the corporate form under Delaware law. *See, for example, In re Foxmeyer Corp.*, 290 B.R. at 244 (refusing to pierce the corporate veil of subsidiary in order to reach the parent holding company). Judson also contends that from 1999 until 2005, CIC was insolvent. Delaware courts, however, have held that "mere insolvency is not enough to allow piercing of the corporate veil. If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless." *Mason,* 2005 WL 1653954 at *3.

Finally, Judson argues that Carroll siphoned funds from CIC. Carroll admits in his deposition testimony that he took advances from CIC, (R. 224, Pl's Resp. to Carroll's Facts, Ex. 2, Carroll Dep. at 36); however, the portion of the deposition provided by Judson ends right after this admission. Judson does not provide any further explanation about this statement, stating

44

only that "CIC made advances to Carroll and its employees made the deposits to Carroll's bank account." (R. 231, Pl.'s Memo. In Opposition to CIC's Mot. for Summ. J. at 6.) This Court is unable to determine, therefore, if Carroll took these advances in his capacity as an officer of CIC, if it was payment for services rendered or to be rendered, or if he was in fact siphoning CIC's funds. We know, at the very least, that Carroll has provided some real estate services for his companies, (see R. 214, Pl.'s Facts, Ex. 16, Flyer), and that he was also an officer of both corporations, so it would not be unusual in itself for Carroll to receive an advance, but given Judson's failure to include the entire deposition transcript or provide more information regarding this statement, this Court will not make unsupported assumptions. Judson also has not provided sufficient evidence that the advances Carroll took from CIC were not supported by consideration. Accordingly, we find that Carroll and CIC are not alter egos and Carroll's motion for summary judgment is granted.

### b.     Elsen[19]

Judson contends that "Carroll's entities are his alter egos and Elsen materially participated." (R. 227, Pl.'s Resp. to Elsen's Mot. for Summ. J. at 5.) Specifically, Judson argues that Elsen materially participated in the control, supervision, and decision-making in the various Carroll entities and aided Carroll in the scheme to defraud Judson. (R. 242, Pl.'s Resp. to Hohberger/Dhimantec's Mot. for Summ. J. at 3.) It is questionable whether we can hold Elsen liable under veil piercing doctrine absent any allegation that CIC or LMC is Elsen's alter ego or that Elsen himself, as an officer of both LMC and CIC, misused or dominated the corporate form.

---

[19] Because Elsen was an officer of both CIC and LMC, we must apply Delaware and Illinois law respectively, which essentially involves the same analysis. *Retzler,* 723 N.E. 2d at 354.

45

*See, e.g., Wallace v. Wood*, 752 A.2d 1175, 1183-1184 (Del. Ch. 1999) (a plaintiff must allege facts that, if taken as true, demonstrate the shareholder or officer's complete domination and control of the corporation); *Peetoom v. Swanson*, 778 N.E.2d 291, 295-96 (Ill.App. 1992) ("a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity").

Judson alleges that Elsen "materially participated" in the activities that allegedly show that CIC was Carroll's alter ego because Elsen was the chief financial officer of CIC, LMC, and another Carroll subsidiary, Wildwood Investments; he signed checks on CIC's bank accounts; and he approved CIC's invoices and decisions by subsidiaries to borrow money. It is not clear to this Court, however, how any of these actions involve a misuse of the corporate form when they were undertaken in his capacity as chief financial officer. In effect, how are any of these actions *wrong?* Generally, "a creditor can bring an action to pierce the corporate veil and hold officers personally liable for wrongfully converting or misappropriating funds." *Circle Sec. Agency, Inc. v. Ross*, 425 N.E. 2d 1283, 1286 (Ill. App. Ct. 1981); *see also Brandywine Mushroom Co. v. Hockessin Mushroom Products, Inc.*, 682 F. Supp. 1307, 1311 (D. Del. 1988) ("An officer of a corporation can be held personally liable for the torts he commits . . . and 'cannot shield himself behind a corporation when he is an actual participant in the tort'") (internal citations omitted). However, Judson has not identified any facts that would implicate Elsen in the alleged scheme to defraud Judson of its judgment. Elsen did not receive any of the proceeds from the sale of LMC's assets; he did not share in the profits of either LMC or CIC; nor did he ever personally guarantee any of CIC or LMC's loans or other obligations. (R. 228, Pl.'s Resp. To Elsen's Facts ¶¶ 15, 18-19.) In fact, Elsen does not own any LMC or CIC stock; has never received anything

46

other than a fixed salary; nor was he a named party in the underlying LMC lawsuit. (*Id.* ¶¶ 15, 18, 25.) This Court will not impose liability based on Judson's assertion that Elsen "had actual knowledge of and materially participated in conduct giving rise to alter ego liability" without sufficient proof that Elsen's conduct contributed to this scheme, that his conduct is otherwise unlawful, or that he completely dominated LMC or CIC. *See United States v. Golden Acres,* 702 F. Supp. 1097, 1113 (D. Del. 1988) ("The alter ego doctrine may be applied even where defendants personally own no stock in the corporation, *so long as the necessary action and total control have been established*") (emphasis added); *C.B. Mills,* 1994 WL 113088 at *9.

Finally, there is no evidence that Elsen committed any type of fraud or something akin to fraud, which is a prerequisite to piercing the corporate veil. *Bestfoods,* 524 U.S. at 62 ("the corporate veil may be pierced and the shareholder [or officer] held liable for the corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's [or officer's] behalf"); *Roiser,* 367 Ill. App. 3d at 566 (stating that courts will only pierce the corporate veil where "adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences"). Accordingly, we grant Elsen's motion for summary judgment.

## C.     Fraudulent Conveyances

In its motion for partial summary judgment, Judson asks this Court to declare that LMC and CIC are a single business enterprise and that certain transfers between CIC, LMC and others be deemed fraudulent. (R. 213, Pl.'s Mot. for Partial Summ. J. At 8.) However, we do not have to decide whether the transactions identified by Judson are in fact fraudulent because LMC is dissolved and we cannot pierce its corporate veil to hold CIC, Dhimantec, Carroll, Elsen, or

Hohberger liable for LMC's judgment. Furthermore, the exhibits that Judson has presented as evidence of the alleged fraudulent transfers, Exhibits 10 and 11, have been stricken because they lack foundation.

We note, however, that Judson's claims of fraud would fail as a matter of law. Under Illinois's version of the UFTA, 740 Ill. Comp. Stat 160/1 *et seq.*, there must be a debtor/creditor relationship in order to establish liability for fraudulent transfers. *Aps Sports Collectibles*, 299 F.3d at 629. LMC is the obvious debtor and we have previously determined that Judson cannot pierce its corporate veil. Therefore, its fraudulent transfer claim cannot proceed against the other defendants, who are not debtors. It is certainly possible, however, that liability could exist under the UFTA based on other theories of liability without having to pierce LMC's corporate veil, but Judson has failed to raise these arguments or present evidence that might support them. *See id.* at 630 n.2 (stating that "other facts might make an insider, or corporate officer, liable under the UFTA because of his or her status as 'first transferee,' 'subsequent transferree' or 'debtor'") (citing to *New Horizon Enter. v. Contemporary Closet Design, Inc.*, 570 N.W.2d 12, 16-17 (Minn. Ct. App. 1997) (assigning personal liability to corporate officer because he was a "first transferee" of an asset within the meaning of the UFTA, thus making it unnecessary for the court to address a "piercing the corporate veil" argument)). Therefore, Judson's partial motion for summary judgment is denied.

## V.  Motion to Compel the Return of a Privileged Document

Defendants filed a motion to compel the return of a Seyfarth Shaw memorandum because of its privileged status. In ruling on motions involving inadvertent production of claimed privileged documents, the Court makes the following inquiry:

48

whether the disputed document is indeed subject to the attorney-client privilege. If the document is not privileged, the inquiry ends. If the document is privileged, the court must then determine if the disclosure was inadvertent. Lastly, even if the document is found to be protected by the attorney-client privilege and inadvertently produced, the court must, nonetheless, determine whether the privilege was waived.

*Harmony Gold U.S.A. v. FASA Corp.*, 169 F.R.D. 113, 115 (N.D. Ill. 1996). The first prong can

be dealt with summarily. The general principles of the attorney client privilege are:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991). The memorandum was prepared by

Seyfarth Shaw attorneys for Defendants and it has ATTORNEY CLIENT PRIVILEGED across

every page. *Harmony Gold U.S.A.*, 169 F.R.D. at 115 ("[t]he privilege applies to

communications both by a client to a lawyer and from a lawyer to a client"). The Seyfarth Shaw

memorandum, therefore, fits within the Seventh Circuit's definition of privileged information.

Accordingly, we find that this document is protected by the attorney client privilege.

Next we must determine if the disclosure was inadvertent. "Documents might lose their

privileged status if the [disclosing] party did not 'take reasonable steps to insure and maintain

their confidentiality.'" *In re Grand Jury Investigation*, 142 F.R.D. 276, 279 (D.N.C. 1992)

(quoting *Suburban Sew 'n Sweep, Inc. v. Swiss-Bernina, Inc.*, 91 F.R.D. 254, 258-59 (N.D. Ill.

1981)). "This rule is grounded in the notion that inadvertent disclosure is a species of waiver and

must be analyzed in that light." *Id.* Judson has produced no evidence that CIC intended to turn

this document over, stating only that "the Bell Boyd lawyers [CIC's attorneys] and the paralegal

49

witnesses [sic] Plaintiff's lawyers scan some of the documents which were marked for copying."

(R. 277, Pl.'s Resp. to Mot. to Compel at 6.) As thousands of pages were produced in this

litigation, this fact certainly does not show the requisite gross negligence required to indicate that

CIC waived its privilege. *Compare Suburban Sew 'n Sweep, Inc.,* 91 F.R.D. at 258-59 (privilege

waived when documents were placed in trash); *see also In re Grand Jury Investigation,* 142

F.R.D. at 279 ("Inadvertent disclosures are, by definition, unintentional acts, but disclosures may

occur under circumstances of such extreme or gross negligence as to warrant deeming the act of

disclosure to be intentional."). Furthermore, this document is clearly marked "ATTORNEY

CLIENT PRIVILEGED" on every page so it would be difficult for this Court to believe, as

Judson asserts, that Carroll "intended to give it." (R. 277, Pl.'s Resp. to Mot. to Compel at 7.)

Once Judson saw that the document was listed on the privilege log, or in the alternative, noted

that the document was marked privileged, Judson should have known that there was a substantial

likelihood that its production was inadvertent.

Finally, we must determine if the privilege was waived. In determining whether there

was a waiver, courts apply one of three approaches: (1) a subjective approach; (2) an objective

approach; and (3) a balancing test. As the *Harmony* court noted:

> Courts following the subjective approach have concluded that inadvertent
> disclosure never results in a waiver because, as the word 'inadvertent' implies,
> there was no intention to waive the privilege. In contrast, courts espousing the
> objective approach hold that even if the disclosure was inadvertent, the
> confidentiality of the document has been breached, thereby destroying the basis
> for the continued existence of the privilege. The last approach, which is the
> balancing test, does not employ an inflexible rule to determine whether a waiver
> has occurred; rather; this approach allows the court to analyze each case
> individually by weighing five factors: (1) the reasonableness of the precautions
> taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of
> the discovery; (4) the extent of the disclosure; and (5) the overriding issue of

fairness.

169 F.R.D. at 116-117. Since there is no consensus in this Circuit, the *Harmony* court opted to follow the objective approach, finding it "more realistic, as well as practical, means to resolve the problem and issues inherent in the nature and circumstances of an inadvertent disclosure." *Id.* at 117. Because of the unique circumstances of the current case and in recognition of the fact that circumstances may not always warrant disregarding privilege, even in cases of inadvertent disclosure, this Court opts to follow the balancing approach.

As mentioned above, Defendants took reasonable precautions to prevent disclosure. There were attorneys and paralegals present while the documents were being turned over to plaintiffs. The document was added to Defendants' privilege log, three months after its initial disclosure, which is not unreasonable considering the fact that 30-40 file boxes of documents were produced on the date in question. The scope of discovery was extensive in this case, and it is likely that Defendants did not intend to waive their attorney client privilege for this document, and its disclosure was an accident. *In re Grand Jury Investigation*, 142 F.R.D. at 279 ("Waivers must typically be intentional or knowing acts."). Furthermore, Judson only relies on one section of the document in question. Such a limited use does not justify privilege being waived as to the entire document.

Judson asserts, however, that either CIC does not have standing to contest the disclosure of the document because Carroll disclosed it, or in the alternative, that CIC waived privilege by giving Carroll a copy of the document. This argument is a nonstarter. As Carroll is the sole shareholder and owner of CIC as well as an officer, the attorney-client privilege belongs to both he and CIC. *Commodity Futures Trading Com. v. Weintraub*, 471 U.S. 343, 348 (U.S. 1985)

51

("the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors"). Furthermore, "[a]s an inanimate entity, a corporation must act through agents" and assertion of the attorney-client privilege "must necessarily be undertaken by individuals empowered to act on behalf of the corporation." *Id.* Therefore, CIC, with Carroll acting on its behalf, has standing to contest the disclosure of the memorandum and privilege was not waived.

Judson also argues that privilege is waived because the memorandum discloses a crime—the alleged fraud that is at issue in the present case. The Seventh Circuit has held that a "communication which otherwise might be subject to attorney client privilege will be held disclosable if there is sufficient evidence to indicate that a crime or fraud has been perpetuated." *U.S. v. Zolin*, 491 U.S. 554, 563 (1989). In one section of the memorandum, Seyfarth Shaw attorneys recommend that LMC propose a settlement to plaintiffs suing LMC (presumably Judson) and if plaintiffs reject the settlement and continue their suit, "it will simply serve to increase legal fees, thereby leaving less for plaintiffs. If this were to occur, LMC would declare bankruptcy and CIC would ultimately share in LMC's remaining assets as a creditor." (R. 224, Pl.'s Resp. to Carroll's Facts, Ex. 14, Seyfarth Shaw memo.) Judson claims that this scheme was in furtherance of the underlying fraud; however, this Court has determined that Judson has presented insufficient evidence of fraudulent transfers. Furthermore, the alleged "scheme" in this memorandum is perfectly legal—filing bankruptcy because of an inability to pay a judgment. More aptly, this memorandum appears to lay out a strategy to minimize CIC's net operating losses rather than contain a plan to defraud creditors, as Judson asserts. Therefore, we find that the privilege was not waived. In the interest of fairness, we order Judson to return the Seyfarth

Shaw memorandum to Defendants and further order that it be stricken from the record.

## CONCLUSION

Carroll's motion to strike exhibits filed with Judson's motion for summary judgment (R. 235-1) is granted in part and denied in part. CIC and Elsen's motion to strike Judson's facts (R. 249-1) is granted in part and denied in part. Defendants' motion for sanctions and to strike (R. 252-1) is granted. Defendants' motions for summary judgment (R. 199-1; R. 203-1; R. 207-1; R. 219-1) are granted. Judson's motion for partial summary judgment (R. 212-1) is denied. CIC's motion to strike and compel the return of a privileged document (R. 270-1) is granted. Carroll's motion to bar evidence (R. 193-1) is denied as moot. Judson's motion to redesignate restricted documents as public documents (R. 273-1) and Judson's motion to designate public documents as restricted documents (R. 276-1) are denied as moot. The Clerk of the Court is directed to enter judgment in favor of the Defendants.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** March 6, 2007